Filed 9/26/22 In re Z.C. CA3

<u>NOT</u> <u>TO</u> <u>BE</u> <u>PUBLISHED</u>

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b). This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

THIRD APPELLATE DISTRICT

(Yolo)

----

| | |
|---|---|
| In re Z.C., a Person Coming Under the Juvenile Court Law. | C094803 |
| YOLO COUNTY HEALTH AND HUMAN SERVICES AGENCY,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>R.C.,<br><br>Defendant and Appellant. | (Super. Ct. No. JV20193243) |

In this appeal, appellant R.C. (mother) assigns error in several respects, related to her contentions that she should have been receiving in-person and therapeutic visits. She also contends the juvenile court misapplied the law and erred in terminating visitation and her parental rights. In a supplemental brief, she argues we must reverse the order terminating parental rights because Yolo County Health and Human Services Agency

1

(Agency) and the juvenile court failed to comply with the inquiry requirements of the Indian Child Welfare Act (ICWA) (25 U.S.C. § 1901 et seq.). We affirm the juvenile court's orders.

FACTUAL AND PROCEDURAL BACKGROUND

Portions of the factual and procedural background are taken from our unpublished opinions filed in mother's previous appeals, *In re A.C. et al.* (Mar. 25, 2021, C092444), *In re A.C. et al.* (May 4, 2021, C093009), and *In re A.C. et al.* (July 22, 2022, C093821/C094543), the opinions and supporting records of which are included in the instant record on appeal. Because this appeal is limited to minor Z.C., we provide background information about siblings A.C. and A.W. only as contextually relevant.

*The Petition and Detention*

On October 21, 2019, the Agency filed a Welfare and Institutions Code section 300 (statutory section references that follow are to the Welfare and Institutions Code unless otherwise stated) petition alleging A.W. (then age 17), A.C. (then age 14), and Z.C. (then age 8) had suffered or were at substantial risk of suffering serious physical harm caused by mother's physical abuse of the minors (§ 300, subd. (a)). On October 16, 2019, over a dispute about the television, mother hit A.W. across the face with a hanger (ultimately breaking it on her), threw a cup at her, and then climbed on top of her and punched her repeatedly on the head. A.C. and Z.C. witnessed this incident. All minors individually feared returning to mother's home and reported that "mother routinely hits them with a whip, a hanger, a brush, or her closed fists." A.W. feared mother would kill her. Marks were observed on Z.C.'s back. Mother told Z.C. to hide signs of the abuse, which he did with clothes. Mother's short temper and physical punishment as well as threats of such punishment put the minors at risk of injury. Mother also withheld food as a punishment.

Mother denied hitting the minors with a closed fist, a hanger, a whip, or a brush and admitted only to spanking the minors. She also admitted her children were scared of

2

her, but denied that any of the injuries observed on the minors were attributable to her, instead providing ambiguous explanations that the injuries occurred at school or during sports.

The minors were detained at the initial hearing on October 22, 2019. All minors reported being afraid of mother at their first visitation and displayed signs of fear. The juvenile court ordered mother receive three hours a week of supervised therapeutic visits to begin after the minors were enrolled in therapy and after mother enrolled in anger management and/or individual counseling. The court awarded the Agency authority to accelerate visitation as appropriate.

*Jurisdiction and Disposition*

The December 19, 2019 jurisdiction and disposition report described an additional incident wherein mother hit A.W. in the face with a pan. The social worker spoke with Z.C., who confirmed his previous statements of mother's physical abuse, which he said occurred " 'a lot,' " but clarified that he had only heard his mother's confrontation with A.W. Z.C. told his maternal grandparents that mother hit him, and they told him to obey mother. Z.C. was glad everyone was engaged in counseling and thought things would be safer at home if mother received treatment for her anger. Z.C. later said that he wanted to go home and planned to stay safe by not upsetting mother.

Mother continued to deny her abusive behavior and accuse A.W. of making up the allegations for personal reasons. She later admitted using a hanger for discipline approximately twice a month. A week after that, she told the social worker the minors should be returned immediately because there was no proof supporting the allegations. When confronted with the proof (including her own previous admissions), mother protested that "she did not leave any marks nor injuries." Mother refused to discuss prior reports that she had been subject to psychiatric holds under section 5150 in 2008 and 2012 and denied that she had any current mental health problems.

3

The social worker worked diligently to secure a therapist for Z.C. and to initiate therapy so his clinician would be able to make recommendations regarding therapeutic visitation. This process was difficult and complicated by Z.C.'s escalating behaviors, necessitating Z.C.'s enrollment in WRAP services. Z.C. had also been placed at Progress Ranch after four failed placements due to his anger, acting out and physical aggression.

The Agency referred mother for counseling, anger management, and parenting classes, which mother had started. According to the head of mother's anger management program, mother denied abusing her children and portrayed herself as a victim. "[M]other appears to have deep denial about her anger issues, struggles with managing anger and has not admitted any behaviors or issues where she has struggled with managing her anger or frustration." Mother was engaged in weekly therapy with Melissa King, MFTI, but the social worker had not been able to communicate with King regarding mother's progress. The Agency further recommended that mother undergo a psychological assessment given her "denial and current decision-making."

At the January 13, 2020 contested jurisdiction and disposition hearing, mother waived her right to testify and present evidence, electing to submit the matter on the petition. The court took jurisdiction and ordered Z.C. (as well as his siblings) dependents of the court and removed Z.C., as well as his sibling, A.C., from mother's custody. The juvenile court ordered reunification services for mother. Mother's case plan directed her to obtain a psychological assessment to determine which mental health services would best benefit her. The plan also directed mother to participate in individual counseling to identify what may be impairing her ability to safely parent. This included that mother "develop an understanding of what constitutes physical and emotional abuse, identify how her past behaviors have impacted her children's physical and emotional health and safety, and coping skills to effectively manage frustration and anger in a healthy, nonthreatening, [and] positive manner." Mother was directed to openly and honestly participate in an anger management/domestic violence program for the same reason.

4

Finally, mother was directed to participate in parent education classes to obtain the skills necessary to parent without being physically and emotionally abusive. Mother's visitation order remained the same following the contested jurisdiction and disposition hearing (three hours per week supervised).

*Six-Month Review*

Mother made minimal progress in her services by the time of the six-month review hearing, held on August 3, 2020, and needed to continue taking classes to "to work on accountability, taking responsibility, gain insight as to her issues and why her children were removed from her care." While she attended classes with limited participation, she continued to deny she physically abused her children and accused her daughter of lying. Mother stated she would not complete her psychological evaluation with the referred provider, although she would not say why. Mother refused assistance in locating another provider. She then hired her own psychologist, but would not sign a release of information so that the psychologist could provide information to the Agency.

Initially, the social worker had received reports that visits between Z.C. and mother went well. Around March or April 2020, visits were changed from in-person to virtual video due to the COVID-19 pandemic. In May 2020, group home staff reported that Z.C. was very resistant to talking to mother during virtual video visits. Z.C. said he had been willing to visit in person because mother had brought snacks to the visits. Z.C. also reported he was afraid to tell mother he did not want to visit, and mother was observed to ignore Z.C. when he would tell her he did not want to talk.

Z.C. had begun individual therapy in December 2019, had successfully completed WRAP services, was doing better in school, and his behavioral issues (including tantrums wherein Z.C. kicked/hit others and/or destroyed others' property) were decreasing. In light of these improvements, Z.C.'s therapist indicated he was ready to step down to a therapeutic foster home but needed one with a lot of experience with children who had suffered trauma and as a result, had challenging behaviors. After several foster homes

5

"fell through," the Agency was finally able to locate an intensive treatment foster home in Shasta County. Z.C. was moved from the group home to the therapeutic foster home in Shasta County on June 22, 2020.

In July 2020, Z.C. began opening up to his foster parents about additional incidents of mother's physical abuse, some of which he had previously disclosed to his therapist, as well as group home staff. Z.C. was diagnosed with posttraumatic stress disorder and mild oppositional defiant disorder. He suffered from nightmares, negative moods, and a refusal to forgive unless the offending individual was first punished. Z.C.'s therapist discussed his reports of abuse with mother, who denied the abuse, accused Z.C. of lying, and demanded to question him about his reports. Z.C. volunteered a preference to live with the maternal grandparents, rather than mother. Z.C. continued reporting mother's abuse and expressed fear that if he was returned home, the abuse would resume, and mother would hide it so that no one would know. He reported he loved and missed her but did not want to go home for fear of what mother might do to him.

Mother diligently visited Z.C. but he struggled with remote video visits on Zoom with mother, often having tantrums after being told it was almost time for visits. Video chats were up to three hours once a week but had to be reduced to one hour a week after Z.C. complained that he was "overwhelmed with all the video telephone call visitations." Z.C. was displaying signs of anxiety and acting out. He sometimes shut down during visits and refused to participate. On one occasion, mother became upset when Z.C. tried to end a video call early to go to the park. Mother called the police complaining that Z.C. was in danger due to coronavirus, resulting in Z.C.'s exclusion from park outings. Z.C. requested help informing his mother that he wanted shorter visits. He was afraid to tell mother he did not want to visit, and when Z.C. attempted to cut visits short, mother ignored his efforts. The reduction in video visits also applied to his grandparents and siblings, which could be increased upon Z.C.'s request.

6

Mother's counsel complained that the real problem with Z.C.'s visits with mother was the Zoom medium, not mother herself, and that he should be immediately returned to her custody so that she could demonstrate what she learned from her services. Z.C.'s counsel vehemently objected to his being returned to mother, highlighting that mother still denied the abuse occurred and had avoided meaningful progress in her court-ordered services. The Agency argued it was unquestionable that there would be a risk to Z.C. if returned to mother, that mother had not meaningfully participated in services, and that mother should be ordered to participate in a psychological evaluation with Dr. Jayson Wilkenfield.

The juvenile court found by clear and convincing evidence that returning the minors to "mother would create a substantial risk of detriment to their safety, protection, or physical or emotional well-being," that the Agency had complied with the case plan and made reasonable efforts to return the minors, but that mother had "only made minimal progress towards alleviating and mitigating the causes necessitating placement." The court found that even though mother was taking classes, she made minimal progress because she failed to take responsibility for her actions and continued asserting that the minors (who feared her) were lying. The court ordered mother to comply with her case plan, including the execution of all necessary releases of information and that mother participate in the psychological evaluation with Dr. Wilkenfield, and set a 12-month review hearing for December 22, 2020.

*Petition for Modification*

On September 28, 2020, mother filed a section 388 petition seeking to modify the court's previous order that visitation would be "at the discretion" of Z.C. Mother requested therapeutic visits and a minimum of three hours of supervised visitation per week. She argued that Z.C. had engaged in only three visits in the past two months and that the current visitation order thwarted reunification, was contrary to the best interests of Z.C. and did not provide "reasonable services." As support for her motion, mother

7

attached an e-mail from the social worker detailing the five dates that Z.C. refused to visit and the three dates where visitation occurred. The court ordered the parties to appear on October 26, 2020, to discuss whether there should be an evidentiary hearing on mother's motion to modify the visitation order.

At the October 26, 2020 hearing, Z.C.'s counsel indicated that the visitation order needed rewording, but that the existing order had been positive in allowing Z.C. to determine when he was ready to visit with mother. Z.C.'s counsel relayed that Z.C. had been having visits with mother lasting between 15 and 45 minutes and that having some control over whether to have the visits had been positive for him therapeutically. Recognizing mother's desire for consistency in those visits, Z.C.'s counsel recommended one hour of visitation per week to take place over Zoom. Zoom visitation was necessitated by the fact that the foster parents had an ailing parent living in the home, underscoring the importance of following COVID-19 restrictions. Z.C.'s counsel recommended that the court order discretion to transition to in-person visits if they could be done safely, and in coordination with Z.C.'s therapist to assure his emotional well-being. Z.C.'s court-appointed special advocate (CASA) worker added that Z.C. would like to visit with his siblings more frequently, but he had not discussed his wishes for visitation with mother. The Foster Family Agency (FFA) social worker expressed that Z.C. wanted to visit his siblings three times a month, his grandparents once a month for an hour, and his mother once a month just to check in.

The Agency concurred with the request for Z.C. to receive one-hour weekly visits via Zoom with the Agency's discretion to switch to in-person visits, consistent with COVID-19 protocols. As to mother's request for therapeutic visits, there was not a current therapeutic visit option available. Z.C. remained placed in the intensive treatment foster home in Shasta County. The Agency argued that any in-person visits with mother should occur in Shasta County, as they believed it would create an impediment to a positive visit to transport Z.C. for two-and-a-half hours from the foster home to

8

participate in the visit. The Agency was willing, however, to assist mother with transportation, should in-person visits occur, so that they could occur in Shasta County.

Mother continued to request therapeutic visits and changed her request to six hours per week of in-person visits with Z.C. Z.C.'s counsel argued such an increase would be harmful to Z.C. and noted mother had failed to make adequate progress in her therapy to justify such robust visitation. The juvenile court ordered visitation between Z.C. and mother for one hour once a week via Zoom, with discretion to increase the visits and/or transition those visits to in-person as determined to be safe and if it was determined to be in Z.C.'s best interests after consultation with his attorney.

*12-Month Review*

Z.C. remained in the intensive services foster care home in Shasta County. A.C. had made further disclosures of abuse by mother, including mother hitting Z.C. with a hanger, leaving marks all over his arms and back, and then making Z.C. wear a sweater to hide the marks. A.C. also disclosed that mother would make the older siblings hit Z.C. with a hanger. Z.C. had also recently disclosed further incidents of mother's abuse to his foster parents. He reported that mother would spank him many times, and she made him choose whether he would get hit with a whip or a stick. He further reported mother would beat his sister, leaving his sister with bruises all over. Z.C. also became very distressed describing mother's abuse of the family dog.

Z.C. was also struggling with the Zoom visits with mother. On August 19, 2020, when Z.C. had not wanted to participate in a Zoom visit, he told his foster parents he was still mad at her for what she did to him, and he gets nervous when he talks to her and stated, "I don't want to make her mad." The foster parents tried various ways to encourage him to visit, but he continued to say that he was afraid of mother and afraid that if he went home, she would spank him for what he said. When the social worker asked him why he would not visit with mother, he reported that he was scared and his

9

visits remind him of the times she would hit and hurt him. He also said he was scared the social worker would take him back to live with his mother.

Z.C. would break down and cry when asked to visit mother and would become upset if the foster parents offered a reward for attending a visit. Despite encouragement from the social worker and foster parents, Z.C. would frequently refuse visits and show signs of distress and anxiety when pressured to participate.

Visits continued to take place virtually due to a high risk of COVID-19 infection and a stay-at-home-order in Shasta County where Z.C. resided. On November 10, 2020, mother requested in-person visitation. The social worker replied that they "have not been able to safely transition to in-person visit due to the increase in COVID-19 cases in the different counties. Shasta County is continuing to see an increase in COVID-19 cases and at this time, [Z.C.'s] [FFA] does not believe it is safe for in-person visits to occur. We will continue to assess and monitor this situation." Mother asked for in-person visits again in December 2020. The social worker again responded that there were no in-person visits due to COVID-19 and also noted that Z.C. lives in a home with an individual with a compromised immune system and it would not be safe to do in-person visits, further noting the court's order provided for Zoom visits.

Mother had continued in counseling but still denied the physical abuse and would not take responsibility for it. She also had yet to submit to the court-ordered psychological evaluation.

On December 22, 2020, Mother requested a contested 12-month hearing, which was scheduled for January 20, 2021. She again requested in-person visits. The Agency and Z.C.'s counsel objected due to the worsening situation with COVID-19 and Z.C.'s extreme fear of the mother and severe reactions to the Zoom visits with her. He was reported to do well on Zoom visits with his grandparents. Because an elderly relative lived with the foster family, they had to be very cautious about COVID-19, and had continued homeschooling. Even the social worker was not permitted inside the home.

10

The juvenile court ordered that in-person visits were out of the question due to the current COVID-19-related situation.

The Agency filed an addendum for the contested hearing, which had been reset to February 1, 2021. The report documented a serious reaction by Z.C. when he was asked to participate in a Zoom visit with mother on January 6, 2021. He yelled and seemed very stressed and curled up in a contorted position on the floor. His therapist reported concern about his reactions and his response to visits with mother and described his recent reaction as a sign of distress. She further reported that Z.C. was not yet ready to start the trauma work and she was working on building a rapport with him and developing coping skills.

On February 1, 2021, the matter was continued again because mother still had not submitted to the court-ordered psychological evaluation. It was noted that Z.C. had refused to participate in every visit, all of which were to have been video visits, with mother since the December 22, 2020 hearing and was exhibiting severe anxiety and stress when he was asked to visit. Due to Z.C.'s reactions when pressured to participate in a visit, the juvenile court ordered Z.C. be offered a visit and if he says "No," then there was to be no more discussion, even if it was encouragement.

Mother's psychological evaluation was finally completed on February 9, 2021. She was diagnosed with an unspecified impulse control disorder borderline, and narcissistic personality traits and negativistic personality features were noted. She still did not acknowledge responsibility for the reason her children were removed and denied her children's reports of physical abuse. Mother downplayed or avoided discussion of any events in the record that cast her in a negative light. The evaluator reported that despite all the services, mother continued to deny the abuse and therefore there was little reason to believe the children would be at any less risk than at the beginning of the case and there were no additional services he would recommend that would alleviate the risk factors.

11

The hearing took place on February 22, March 12, and March 17, 2021. Mother's therapist testified regarding mother's treatment goals and participation and stated that she would benefit from further therapy. Mother had never acknowledged physical abuse other than "spanking," she was not willing to talk about certain issues related to the abuse and she continued to state that the children were lying.

Neither of mother's two anger management instructors were able to report that mother had benefited from their instruction; one reported that mother had trouble taking responsibility for her actions and lacked empathy.

Z.C. was still receiving counseling but he no longer needed the WRAP services for behavior and mental health that had been previously necessary. His therapist reported that Z.C. was making progress and she had tried to start the process of the trauma work, but he was not yet ready, so she was addressing his other treatment goals such as positive coping skills and identifying his feelings. Neither his current nor his prior therapist had recommended any different type of therapy for Z.C. and neither had indicated that Z.C. was not making appropriate progress in therapy. The social worker testified that there was no timeline set for someone to progress through their trauma work.

Z.C. was doing well in his foster home where he had foster parents who were trained to address his behaviors and provide the emotional support he needed. He was reported to trust and love his foster parents and his problematic behaviors had decreased while in their care. Z.C. had become comfortable enough with his foster parents to start disclosing his trauma to them. Visits with mother had continued via Zoom. The social worker testified they had continued via Zoom because the surge in COVID-19 in Shasta County had resulted in the FFA restricting in-person visits. Additionally, the elderly at-risk parent was still living in the foster family's home. The social worker believed it would be detrimental to the Z.C. to move him from his current placement, where he was doing so well and where the foster parents were able to meet his behavioral and emotional needs for the sole purpose of trying to accommodate in-person visits with

12

mother. Additionally, the social worker also testified that Z.C. was not emotionally able to handle in-person visits with mother.

Z.C. had shown no resistance to Zoom visits with his siblings or grandparents and seemed to enjoy those visits. But of the 38 scheduled Zoom visits with mother, Z.C. had refused to participate in 22 of them. The visit supervisor testified that Z.C. did not appear to enjoy visits with mother and had never been able to attend the entire hour-long visit. Mother had recently sent a book to Z.C. and had hidden her phone number inside the book on a dark page. When Z.C. found the phone number, he became very upset with mother.

The juvenile court found by clear and convincing evidence that the Agency provided reasonable services to both Z.C. and mother. The court found mother had been given myriad opportunities to benefit from services that she either rejected or tried to manipulate, and even when she did complete services, she learned nothing from them. The court terminated mother's reunification services and set a section 366.26 hearing. It also found visitation for Z.C. with mother was detrimental and ordered it to cease immediately.

*Section 366.26 Hearing*

The section 366.26 hearing took place on September 1 and 2, 2021. The juvenile court followed the recommendation of the Agency and terminated parental rights.

Z.C. was 10 years old and had been out of mother's care for almost two years. He was visiting with his siblings and grandparents, but not with mother. Z.C. was in good health and doing well scholastically. He was continuing in his weekly counseling and received additional behavioral support counseling though his placement, as he was in a placement designated as an intensive services foster care home. His mental health, mood and nightmares were continuing to improve. His therapist reported that he seemed to be doing well, felt safer, had stated he knows mother cannot do anything bad to him, and he has a good relationship with his caregivers. He had met some treatment goals but had not

13

yet completed all his therapeutic goals, and he was not likely ready to push further with his therapeutic trauma work.

The adoptions specialist met with Z.C. and his caregivers to discuss Z.C.'s attitude toward placement and adoption. Z.C. was observed to have a good understanding of adoption, as his caregivers were in the process of adopting another child and the process was discussed freely. Z.C. was happy to hear he had his own adoption worker because he was excited to be adopted by his current caregivers, who were committed to adopting him. He stated he loved his caregivers, wanted to remain in their home, and expressed happiness that he would be adopted and would not be going back to his mother's care. He had formed a healthy and reciprocal relationship with his caregivers, to whom he looked to meet his physical and emotional needs. He had been placed in their home since June 22, 2020.

Additional facts are included in our discussion of the issues.

DISCUSSION

I

*Reasonable Services Finding at the 12-Month Review*

Mother contends the juvenile court's finding, made at the 12-month review hearing for minor Z.C., that reasonable services were provided is not supported by the evidence because the Agency did not provide in-person visits nor facilitate therapeutic visits between Z.C. and mother. She argues that, although this court previously affirmed findings from both the six-month review hearing, and the October 26, 2020 hearing on mother's petition for modification, that nontherapeutic virtual visits were reasonable, the continuance of such visits up to the March 2021 12-month review hearing, without transitioning back to in-person visits, was unreasonable. We reject this contention.

"At each review hearing, if the child is not returned to his or her parent, the juvenile court is required to determine whether 'reasonable services that were designed to aid the parent . . . in overcoming the problems that led to the initial removal and the

14

continued custody of the child have been provided or offered to the parent . . . '
(§§ 366.21, subds. (e)(8) & (f)(1)(A), 366.22, subd. (a).) The 'adequacy of reunification plans and the reasonableness of the [Agency's] efforts are judged according to the circumstances of each case.' [Citation.] To support a finding that reasonable services were offered or provided to the parent, 'the record should show that the supervising agency identified the problems leading to the loss of custody, offered services designed to remedy those problems, maintained reasonable contact with the parents during the course of the service plan, and made reasonable efforts to assist the parents in areas where compliance proved difficult . . . .' " (*In re M.F.* (2019) 32 Cal.App.5th 1, 13-14, italics omitted.) The services provided do not have to be the best services that could have been provided, rather they must have been reasonable under the circumstances. (See *Elijah R. v. Superior Court* (1998) 66 Cal.App.4th 965, 969, citing *In re Misako R.* (1991) 2 Cal.App.4th 538, 547.)

We review the juvenile court's determination of reasonable services for substantial evidence. (*In re Christina L.* (1992) 3 Cal.App.4th 404, 414.) When the juvenile court does not continue the case to the permanency planning review hearing and sets a section 366.26 hearing, the court must find reasonable services have been provided by clear and convincing evidence. (§ 366.21, subd. (g)(4).) "When reviewing a finding that a fact has been proved by clear and convincing evidence, the question before the appellate court is whether the record as a whole contains substantial evidence from which a reasonable fact finder could have found it highly probable that the fact was true. In conducting its review, the court must view the record in the light most favorable to the prevailing party below and give appropriate deference to how the trier of fact may have evaluated the credibility of witnesses, resolved conflicts in the evidence, and drawn reasonable inferences from the evidence." (*Conservatorship of O.B.* (2020) 9 Cal.5th 989, 1011-1012.)

In mother's previous appeal from the six-month review hearing (*In re A.C. et al., supra*, C092444), mother argued the Agency failed to provide reasonable services prior to the six-month review hearing because she was not provided in-person visits with Z.C. She also contended that the juvenile court's six-month review order did not provide for reasonable visitation thereafter because, despite Z.C. having been placed into a therapeutic foster home with a high-risk family member and a recent death in the family due to COVID-19, the court should have ordered in-person visits. For the reasons set forth in our opinion in case No. C092444, we rejected these contentions, concluding mother "has not shown that it was unreasonable given the considerations of the ongoing COVID-19 epidemic for the Agency to continue her *supervised* visits in an online medium, nor did she seek relief from the court for any perceived deficiency arising from the manner of those visits." (*In re A.C. et al., supra*, C092444 [at p. 16].)

In mother's subsequent appeal from the October 26, 2020 modification order (*In re A.C. et al., supra*, C093009), mother again challenged the juvenile court's order limiting Z.C.'s visitation with mother to one-hour weekly Zoom visits. As previously stated, the juvenile court had determined that Z.C.'s visits should be limited to one hour a week via Zoom with discretion to increase the visits and/or transition to in-person visitation as determined to be safe and in Z.C.'s best interests. We reviewed the propriety of that order utilizing the rules associated with the review of visitation orders generally and affirmed, finding no abuse in the juvenile court's balancing of mother's desire for in-person visits with the dangers associated with the COVID-19 pandemic and Z.C.'s interest in maintaining his placement.

Mother now argues that the Agency's failure to transition back to in-person visits, as authorized by the juvenile court's October 26, 2020 modification order, "as well as the Agency's efforts to facilitate therapeutic visits," as authorized back at detention, was unreasonable. Thus, she argues, the juvenile court's March 2021 12-month review

16

hearing order, which found the Agency had provided reasonable reunification services, was not supported by the evidence.

## A.

### *Appealability*

First, we briefly address mother's contention that she may raise issues arising from the 12-month review hearing in this appeal because she filed a petition for extraordinary writ pursuant to California Rules of Court, rule 8.452, which was denied summarily on the merits. (*R.C. v. Superior Court of Yolo County* (C093790, petn. den. May 13, 2021); *Joyce G. v. Superior Court* (1995) 38 Cal.App.4th 1501 (*Joyce G.*).) We take judicial notice of the court file in that proceeding, case No. C093790. (Evid. Code, § 452, subds. (c), (d).) Mother is correct that she may re-raise the issue she raised in her petition for extraordinary writ, although her reasoning is in error. She may re-raise the issue *not*, as mother contends, because it was not decided on the merits, but because her petition was summarily denied. (*Joyce G.*, at pp. 1513-1514 [petition can be considered on its merits and still be summarily denied].)

"Subsequent appellate review of findings subsumed in an order setting a section 366.26 hearing is dependent upon an antecedent petition for writ review of those findings having been 'summarily denied . . . .' " (*Joyce G., supra*, 38 Cal.App.4th at p. 1513; § 366.26, subd. (*l*).) Mother's writ petition raised the issue of substantial evidence to support the finding that reasonable services were provided. Specifically, she argued she was not provided reasonable visitation services with Z.C. because the Agency did not make reasonable efforts to provide meaningful visitation and the appropriate therapeutic services to mend her relationship with Z.C. The petition was summarily denied *on the merits*. When "the denial is summary, the petitioner retains his or her appellate remedy (§ 366.26, subd. (*l*)(1)(C)) but is *limited to the same issue on the same record* (§ 366.26, subd. (*l*)(1)(B)) and thus is destined on appeal to receive the same result." (*Joyce G.*, at p. 1514, italics added.) Thus, while mother may again argue the evidence did not support

17

the juvenile court's reasonable services finding at the 12-month review hearing, we again reject her contention.

B.

*In-Person Visitation*

Initially we note it does not appear there was any change in the foster family's concern for the health of the elderly parent living in the home. By all accounts, the relative was still living there and the children in the home were still being homeschooled due to COVID-19 concerns. It was reasonable for the Agency to continue to offer visits in a virtual format based on the specific facts of this case, Z.C.'s need for a specialized foster home, his drastic improvement since being placed in that home, and the special requirements of that home due to high-risk family member who resided in the home. Thus, the condition precedent to the juvenile court's order providing the Agency with discretion to transition to in-person visits—that such visits were determined to be safe— had not been met.

Moreover, it is clear that, subsequent to the juvenile court's October 26, 2020 modification order, there was not only no improvement in the quality of mother's visitation with Z.C. or his reaction to such visits, but rather, a decline in such. Z.C. would exhibit severe anxiety and stress at the mere suggestion of visits with mother, including crying, yelling and even curling up in a contorted position on the floor—a sign Z.C.'s therapist stated was a sign of distress and caused her concern. The Agency would have been derelict in its responsibilities to have forced (or attempted to force) Z.C. to participate in in-person visits. In fact, even the virtual visits were so detrimental to Z.C. that first the court ordered Z.C. be permitted to refuse visits without subsequent pressure to attend, and then ordered the visits ceased entirely.

Additionally, it does not appear in the record that Z.C.'s attorney had been consulted, let alone had approved, transition to in-person visits. Thus, the other condition precedent to the juvenile court's order providing the Agency with discretion to transition

18

to in-person visits—that such visits be determined to be in Z.C.'s best interests after consultation with his attorney—had not been met either.

Mother posits that Z.C.'s "feelings about and issues with" visitation pertained only to virtual visits, not in-person visits. The evidence suggests otherwise. While Z.C. did, at one point, complain about having too many Zoom visits with all his family members, he subsequently had the number of such visits reduced. Thereafter, he appeared to have no difficulty with Zoom visits with his siblings or grandparents—only with mother. In fact, on one occasion in August 2020, Z.C. had been excited when his caregivers logged in to facilitate a virtual visit but, once he discovered it was a visit with mother and not his maternal grandparents, he became frustrated and made clear he had no desire to speak with mother.

Moreover, Z.C.'s objection to visits did not coincide only with the change from in-person to virtual visits. It also coincided with his disclosure of additional abuse perpetrated by her, his statements that he was scared and mad, his disclosure that visits reminded him of mother's abuse, and his statements that mother would become angry or refuse to listen to him when he would ask to end visits early. Finally, while Z.C. did at one point agree that in-person visits are preferable to virtual visits, that remark was made early in these proceedings and also appeared to be based largely on the fact that mother would bring him snacks.

While visitation is an essential component of any services provided pursuant to the reunification plan (*In re Alvin R.* (2003) 108 Cal.App.4th 962, 972 (*Alvin R.*); accord, *In re M.F., supra*, 32 Cal.App.5th at p. 16.), it need not be devoid of limitations. Any visitation order, and indeed the one in this case, must be pursuant to the minor's best interests. Z.C. was clearly distressed by his virtual visits with his mother, as shown by his acting out prior to visits and refusal to participate in them. Additionally, mother had made little if any progress in alleviating the circumstances causing Z.C.'s removal. Mother failed to benefit from either of her anger management programs, consistently

19

failed to participate in a psychological evaluation, hired her own psychologist, then failed to sign releases of information to allow the sharing of information between her psychologist and the Agency, and consistently denied the abuse occurred, despite overwhelming evidence that it had.

In its October 2020 ruling on mother's petition for modification, the juvenile court allowed the Agency the discretion to increase visits and/or transition those visits to in-person as they determined to be safe and in Z.C.'s best interests. Given Z.C.'s increase in distress surrounding his mother's visits and the continued COVID-19 concerns in the foster family home, the decision of the Agency not to transition to in-person visits with mother does not undermine the juvenile court's finding at the 12-month review hearing, that the Agency provided reasonable services.

## C.

### *Therapeutic Visits*

We likewise reject mother's contention that the Agency's failure to facilitate therapeutic visits, as authorized back at detention, was unreasonable. First, we reject mother's contention that Z.C.'s "feelings about and issues with" visitation pertained only to virtual visits, not in-person visits, and he otherwise enjoyed visiting mother. There is no evidence of such. Mother acknowledges that Z.C. said he did not like visiting with her, and that he expressed a fear of being sent back to live with her. Given Z.C.'s reaction to the suggestion of video visits with mother, it is difficult to see how in-person visits, even in a therapeutic setting, would soothe him.

Nor do we find that the Agency was required to arrange for therapeutic visits to have been found to have provided reasonable services. Mother's last in-person visit with Z.C. was in March 2020. She had been in counseling with the same counselor since October 2019 yet that counselor had *never* indicated mother was ready for therapeutic visits. Likewise, neither of Z.C.'s therapists ever indicated he was ready for therapeutic visits. To the contrary, Z.C., who had been diagnosed with posttraumatic stress disorder,

20

reported his visits reminded him of the times mother hit and hurt him. Z.C.'s therapist reported he was making progress and she had tried to start the process of the trauma work, but he was not yet ready, so she was addressing his other treatment goals such as positive coping skills and identifying his feelings. Neither his current nor his prior therapist had recommended any different type of therapy for Z.C. and neither had indicated that he was not making appropriate progress in therapy.

Mother argues *Alvin R., supra*, 108 Cal.App.4th at page 965 compels a finding that therapeutic visits or family therapy was required in order to have provided reasonable services in this case. *Alvin R.* is inapposite. As recognized by mother, in *Alvin R.*, a key component of that reunification plan was that the father and his son participate in conjoint counseling, after the son had participated in eight sessions of individual counseling. (*Id.* at p. 965.) The son had refused all visits for four months and the social worker knew it was unlikely he would ever agree to visits without conjoint therapy; and she knew conjoint therapy would not occur until the son was in individual therapy. (*Id.* at p. 973.) The appellate court reversed the juvenile court's finding that reasonable services were provided because the department had failed to timely effectuate individual counseling for the son, unreasonably delaying conjoint counseling and visitation. (*Ibid.*)

Here, the case plan provided for Z.C. to be "referred to appropriate mental health services to meet [his] needs" to "include individual counseling, conjoint/family counseling *if and when recommended by the child's provider*, and specialty mental health services . . . as recommended by the child's provider." (Italics added.) Significantly, neither of Z.C.'s therapists ever recommended therapeutic visits, family therapy, or any other additional therapeutic services for Z.C. Thus, the Agency's failure to provide therapeutic visits in this case did not render the services unreasonable.

21

D.

*Full Benefit of Reunification Period*

Finally, we briefly address mother's contention that she was "denied the full benefit of her reunification" period because there were "nearly three months" (specifically, the time between August 4, 2020, and October 26, 2020—amounting to 83 days) prior to the modification in October 2020 wherein the court's order improperly provided Z.C. with discretion whether to visit with mother. Therefore, she reasons, the court's order rendered services throughout the reunification period unreasonable. In considering and rejecting this contention, we note that the 12-month review hearing did not conclude until March 17, 2021—12 months plus an additional 86 days after the date Z.C. entered foster care (here, December 21, 2019). (§§ 341.49, 361.5, subd. (a)(1)(A).) Thus, even allowing for the 83 days the invalid visitation order was in effect, mother received "the full benefit" of her 12 months of reunification services.

II

*Termination of Visitation*

Mother next contends the juvenile court's order, entered at the 12-month review hearing, terminating visitation was an abuse of discretion. She acknowledges that she did not raise this issue in her extraordinary writ petition, as required to preserve the issue for further litigation (§ 366.26, subd. (*l*)), but argues she should be permitted to raise it, nonetheless, because her counsel rendered ineffective assistance in failing to include it in her writ petition. To establish ineffective assistance of counsel in dependency proceedings, a parent must establish both that his or her attorney's representation was deficient, and that this deficiency resulted in prejudice. (*In re Dennis H.* (2001) 88 Cal.App.4th 94, 98.) Mother has not established either prong here.

Mother argues the order "was an abuse of discretion because there was no substantial evidence *in-person* visitation with mother would be detrimental to [Z.C.] – particularly if the grandparents were present during the visitation." She argues that "[f]or

22

the same reasons as set forth in Section I(D)(2)(i) [of her brief arguing the Agency should have transitioned back to in-person visits], *ante*," the court should not have found in-person visits detrimental. For the same reasons we rejected her argument, *ante*, we reject it here and find no abuse of discretion in the court's finding of detriment. Since the court did not abuse its discretion, inclusion of the issue in the extraordinary writ was unnecessary and no prejudice ensued. (*People v. Constancio* (1974) 42 Cal.App.3d 533, 546 ["It is not incumbent upon trial counsel to advance meritless arguments or to undertake useless procedural challenges merely to create a record impregnable to assault for claimed inadequacy of counsel"].)

### III

### *Due Process*

Mother contends "the order terminating parental rights must be reversed because the Agency and juvenile court unreasonably delayed reinstating in-person visitation, and failed to facilitate therapeutic visitation, violating mother's due process rights to litigate and establish the parental-benefit exception to adoption." Mother did not make a due process challenge below, but again contends we must nonetheless address the issue because she received ineffective assistance of counsel. We reject her contention.

As we have already explained and concluded herein, neither the Agency nor the juvenile court unreasonably failed to transition to in-person or therapeutic visits. Thus, mother's contention that her due process rights were violated fails, regardless of whether her counsel had preserved the issue for appeal. (See *In re N.M.* (2008) 161 Cal.App.4th 253, 270.)

### IV

### *Beneficial Parental Relationship Exception to Adoption*

Next, mother contends "[t]he juvenile court misapplied the law and erroneously excluded relevant evidence when determining whether the parental-benefit exception to adoption applied." We reject this contention, as well.

23

## A.

### *The Exception*

At a section 366.26 hearing, the juvenile court "shall terminate parental rights and order the child placed for adoption" if it finds "by a clear and convincing standard, that it is likely the child will be adopted." (§ 366.26, subd. (c)(1).) Juvenile courts should decline to terminate parental rights only in " 'exceptional circumstances' " where the parent "can establish termination would be detrimental to the child under one of the statutory exceptions." (*In re D.P.* (2022) 76 Cal.App.5th 153, 163.) One such exception is the beneficial parental relationship exception, which applies when "[t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (§ 366.26, subd. (c)(1)(B)(i).) For the exception to apply, "the parent must show that terminating that attachment would be detrimental to the child even when balanced against the countervailing benefit of a new, adoptive home." (*In re Caden C.* (2021) 11 Cal.5th 614, 636 (*Caden C.*).) There are three elements needed to establish this exception: "(1) regular visitation and contact, and (2) a relationship, the continuation of which would benefit the child such that (3) the termination of parental rights would be detrimental to the child." (*Id.* at p. 631, italics omitted.)

## B.

### *Additional Background*

The section 366.26 hearing took place on September 1 and 2, 2021. In addition to her own testimony and the testimony of the maternal grandmother and grandfather, mother offered, and the court admitted, the following documents into evidence: (1) a February 21, 2021 letter from Reverend Ricardo Mendez stating mother loves her children, can provide a loving home, and had made strides in becoming a better parent; (2) a letter dated January 31, 2021, in support of mother's character; (3) several other third party letters stating the author had never seen mother abuse her children and relating

24

to mother's relationship with her children; and (4) over 300 photographs, primarily family photographs of mother and her children.

The court excluded as irrelevant: (1) letters dated March 2, 2021, April 13, 2021, June 4, 2021, and July 12, 2021, reflecting mother's enrollment in January 2021 into a series of parenting courses—the fourth and final of which was to end on September 21, 2021; (2) a January 22, 2021 letter to mother's counsel from mother's therapist regarding mother's progress in outpatient psychotherapy services, which had been written prior to the therapist's testimony at the 12-month review hearing; and (3) 10 letters in support of the maternal grandparents' character. The court noted that the therapist's letter about mother's progress in counseling was also "to[o] old."

Thereafter, mother presented some additional photographs, which were marked for identification. The county and Z.C.'s counsel objected on the basis of relevance and lack of foundation, as the photos did not reflect of what and when they were taken. Mother's counsel responded the photos pertained to the bond between mother and Z.C., and indicated she intended to have mother discuss them during her testimony. The court deferred its ruling.

Mother then testified as to Z.C.'s likes and dislikes, her favorite memories, and that she has saved all of his drawings since he was very young. She testified that, back when they had in-person visits, Z.C. seemed excited to see her and they would cook, eat, and play games. They sat and talked about school and his friends, and she would sometimes help with his homework. Mother said Z.C. said his number one wish was to come home. She testified they had a bond and he meant the world to her.

Mother was shown a photograph counsel wanted to have admitted into evidence. Mother testified it was a photograph taken during a Zoom visit. She would have Z.C. close his eyes, she would close her eyes and hug herself while pretending she was hugging him. Z.C. had closed his eyes and hugged himself, indicating he was pretending she was hugging him. Mother's counsel indicated that many of the photos she was

25

seeking to admit were photos of mother and Z.C. hugging themselves. County counsel objected for lack of foundation as to when the photos were taken. The court noted that half of the photos were taken when mother's children were very young. Mother's counsel then requested the court admit those photos (the first four in the packet) that were photos taken during Zoom visits. Mother's counsel represented those photos were taken in September 2020. The court excluded them stating "[a]ssuming that's true, I'm going to sustain the objection because the 2020 photo would not be relevant for this particular proceeding."

After finding Z.C. adoptable, the juvenile court turned to consideration of the beneficial parental relationship exception to adoption. The court began by stating mother had met the consistent visitation requirement and additionally found "The relationship is a parent-child relationship and not a friendship. That's sort of hard to tell but let's give her that as well." The court continued: "But then I also find -- have to find that benefit to the child of maintaining that relationship would outweigh the benefit of adoption to such a degree that termination of parental rights would greatly harm the child. In this case, [Z.C.] has been consistent in his displayed fear of his mother. Contact with his mother has been very detrimental and has caused severe trauma and he has been expressing a desire not to see her and he wishes to be adopted. I don't know how I can find, because mom testifies that she loves him and she wants him back and that they have a great relationship, that . . . it is in his best interest to not let him be adopted because mom would benefit from that decision, not [Z.C.]. [Z.C.] most certainly would not benefit from that decision and it is absolutely not in [Z.C.]'s best interest not to terminate parental rights. I cannot find there's a significant parental bond."

## C.

### *Analysis*

Mother contends the juvenile court did not consider her relationship with Z.C. over time (before and throughout the dependency proceedings) in considering whether it

26

was a significant and positive one for Z.C. This is evidenced, she argues, by the juvenile court's exclusion as irrelevant, the September 2020 photos of Z.C. taken during a Zoom visit and the court's failure to "discuss [Z.C.]'s age or the portion of [Z.C.]'s life spent in mother's custody." She also contends the court erroneously excluded evidence of her parenting classes, erroneously required she prove a significant parental relationship, and erroneously required she prove termination of parental rights would greatly harm Z.C.

There was simply no evidence in this case that Z.C. would be negatively affected by termination of his relationship with mother. By all accounts, the interactions with mother had become extremely harmful to his emotional well-being and he was looking forward to being adopted. Nonetheless, we shall address each of her various contentions of error.

*1. The Photographs*

The juvenile court is required to consider whether there is a significant, positive, emotional parent-child attachment. (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575 (*Autumn H.*).) By the time of the section 366.26 hearing, "the nature and extent of" the parent-child relationship "should be apparent" because "[s]ocial workers, interim caretakers and health professionals will have observed the parent and child interact and provided information to the court." (*Autumn H.*, at p. 575; see also *In re J.D.* (2021) 70 Cal.App.5th 833, 861.) This case is no exception.

Whatever positive relationship mother believed she had with Z.C. years earlier was not evident by the time of the section 366.26 hearing. He had refused to visit her since December 2020 and consistently had substantial, negative emotional distress at even the *thought* of visiting with her. Even assuming Z.C. had some positive relationship with mother in the past, by the time of the hearing, the evidence established he did not have a significant, *positive*, emotional parent-child attachment. (*Autumn H., supra*, 27 Cal.App.4th at p. 575.)

Contrary to mother's contention, it is apparent from the court's ruling that it *did* examine the nature of her relationship, including their visits and contact, with Z.C. during "much of the dependency proceeding." While mother would like to focus on a few positive moments in visits that took place over a year earlier, the court appropriately noted that Z.C. had consistently displayed fear of mother and that contact with mother has been very detrimental and has caused him severe trauma.

The juvenile court has wide discretion to determine the relevance of evidence. (*People v. Kelly* (1992) 1 Cal.4th 495, 523.) In light of the other, more current evidence available to the court, the juvenile court could conclude that photographs taken a year earlier reflecting Z.C.'s demeanor during a virtual visit shed little light on Z.C.'s current relationship with mother and the benefit or detriment that may result should that relationship be terminated. The exclusion of the photos does not convince us that the court did not consider the nature and extent of the parent-child relationship.

### 2. Autumn H. Factors

Mother also complains, in passing, that the juvenile court did not discuss on the record that it was considering the factors in *Autumn H.* of Z.C.'s age or the portion of his life spent in mother's custody. She implies that the court's failure to discuss these factors establishes the court "misapplied the law" and did not consider the nature of her relationship with Z.C. The juvenile court is not required, however, to make independent findings on the record in determining the beneficial parental relationship exception to adoption does not apply. (*In re A.L.* (2022) 73 Cal.App.5th 1131, 1156, 1161.) The record here does not convince us that the court did not consider the appropriate factors and evidence in examining the nature of mother and Z.C.'s relationship.

### 3. Parenting Classes

Mother also argues the court improperly excluded evidence she was taking parenting classes because they showed she was making progress in services. We reject her contention.

28

Since return to parental custody is not before the court at a section 366.26 hearing, a parent's success or struggles, or progress in services or lack thereof, are relevant in this context only where they may mean that interaction between parent and child is positive, or that, at least sometimes has a " ' "negative" ' effect" on the child. (*Caden C., supra*, 11 Cal.5th at pp. 634, 637-638.) Here, mother made no offer of proof that her mere participation in parenting classes, as demonstrated by the letters she sought to introduce, tended to establish that her interactions with Z.C. were positive. Thus, the court did not err in excluding the evidence.

### 4. *Significant Parental Relationship*

Mother also contends that the juvenile court's concluding statement that it "cannot find there's a significant parental bond" interjected an impermissible element into the analysis because, she argues, she does not have to show a *parental* relationship or that she fulfills a parental role in Z.C.'s life. Even assuming mother is correct that she need not have a parental relationship with Z.C., the court presupposed she *had* such a relationship, having stated: "The relationship is a parent-child relationship and not a friendship. That's sort of hard to tell but let's give her that as well." Thus, mother was not prejudiced by her assignment of error.

Fairly construed, however, the juvenile court's closing remark appears directed to whether the bond was "significant" and its finding it was not. We do not agree that the court misapplied the law in making this finding. The juvenile court is required to consider whether there is a significant, positive, emotional parent-child attachment. (*Autumn H., supra*, 27 Cal.App.4th at p. 575.)

### 5. *Great Harm*

Next in mother's list of errors is her contention that the court held her to a higher and improper standard of proof when it said it had to find that the benefit to Z.C. in maintaining his relationship with mother outweighed the benefit of adoption to such a

degree that termination of parental rights would "greatly harm" Z.C. We reject this undeveloped argument.

Interaction between natural parent and child will almost always confer some incidental benefit to the child. (*Autumn H., supra*, 27 Cal.App.4th at p. 575.) Thus, it has been repeatedly held that "[i]f severing the natural parent[-]child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*) On the other hand, when the benefits of a stable, adoptive, permanent home outweigh the harm the child would experience from the loss of a continued parent-child relationship, the court should order adoption. (*Caden C., supra*, 11 Cal.5th at pp. 633-634; *Autumn H.*, at p. 575.)

Mother cites *Caden C.* and states simply, that this long-used standard including the language of "greatly harmed" is "a higher standard than the standard articulated by *Caden C.*" and, therefore, the juvenile court "improperly elevated mother's burden." *In re Brittany C.* (1999) 76 Cal.App.4th 847, not cited by mother, specifically addressed whether the "greatly harmed" language misinterpreted the statute and held it did not, stating: "To require that the parent need only show some, rather than great, harm at this stage of the proceedings would defeat the purpose of dependency law, that is, the protection of 'children who are physically, sexually or emotionally abused, neglected or exploited. (§ 300.)' " (*Id.* at p. 853.)

### 6. *Z.C.'s Fear of Mother*

Mother next contends the court abused its discretion in not finding the beneficial parental relationship exception applied because the court's finding that Z.C. "has been consistent in his displayed fear of his mother" is unsupported by the record. She argues he only expressed fear of returning home—not of mother, herself. In making this argument, mother construes the record in her favor, ignoring the well-established rule that the juvenile court is the finder of fact, and we construe the record in the light most

30

favorable to the juvenile court's order. (*In re Zeth S.* (2003) 31 Cal.4th 396, 405; *In re Babak S.* (1993) 18 Cal.App.4th 1077, 1088-1089.)  We also presume in support of the juvenile court's finding the existence of every fact the trier could reasonably deduce from the evidence and make all reasonable inferences that support the finding. (*In re Babak S.*, at p. 1089.)

We will not inventory each and every piece of evidence supporting the juvenile court's findings.  Instead, we list a few we have already recited herein:  (1) *all of* the minors reported being afraid of mother at their first visitation and displayed signs of fear through facial expressions and body language; (2) when asked why he would not visit with mother, Z.C. reported, on more than one occasion, that he was scared and his visits remind him of the times she would hit and hurt him; and (3) Z.C. reacted by yelling and curling up in a contorted position on the floor in response to the thought of having to visit with her.

This evidence was more than sufficient for the juvenile court to find Z.C. had displayed a fear of mother—not just a fear of having to return to living with mother.  We find no error here.

V

*ICWA Inquiry*

In her supplemental brief, mother contends the Agency failed to make an adequate inquiry of extended family members—specifically, the maternal grandparents—to determine if Z.C. had Indian ancestry.  We conclude any error was harmless.

A.

*ICWA-Related Facts*

Z.C. was taken into protective custody on October 17, 2019, prior to the filing of the section 300 petition.  In its detention report, the Agency reported that, "[i]n accordance with the Indian Child Welfare Act, the Agency made inquiries as to Native American ancestry of the minors" and that, on October 17, 2019, mother had reported

31

that her side of the family had no Native American ancestry.  Mother also informed the Agency that the identity of Z.C.'s father is unknown.

On October 22, 2019, mother signed an ICWA-020 form, checking the box indicating:  "I have no Indian ancestry as far as I know."  The juvenile court found the ICWA did not apply at the October 22, 2019 detention hearing.  Mother and the maternal grandfather were present at that hearing.

B.

*Applicable Law*

As this court recently explained:  " 'The ICWA protects the interests of Indian children and promotes the stability and security of Indian tribes by establishing minimum standards for removal of Indian children from their families, and by permitting tribal participation in dependency proceedings.  [Citations.]  A major purpose of the ICWA is to protect "Indian children who are members of or are eligible for membership in an Indian tribe."  [Citation.]'  (*In re A.W.* (2019) 38 Cal.App.5th 655, 662.)  The ICWA defines an ' "Indian child" ' as a child who 'is either (a) a member of an Indian tribe or (b) is eligible for membership in an Indian tribe and is the biological child of a member of an Indian tribe.'  (25 U.S.C. § 1903(4).)  The juvenile court and the social services department have an affirmative and continuing duty, beginning at initial contact, to inquire whether a child who is subject to the proceedings is, or may be, an Indian child.  (Cal. Rules of Court, rule 5.481(a); § 224.2, subd. (a).)"  (*In re G.A.* (2022) 81 Cal.App.5th 355, 360, petn. for review pending, petn. filed Aug. 19, 2022, S276056.)

Section 224.2, subdivision (e) provides that if the court or social worker has *reason to believe* that an Indian child is involved in a proceeding, the court or social worker shall, as soon as practicable, make further inquiry regarding the possible Indian status of the child.  As relevant here, further inquiry includes interviewing the parents, Indian custodian, and extended family members to gather the information required in paragraph (5) of subdivision (a) of section 224.3.  (§ 224.2, subd. (e).)

32

" '[S]ection 224.2 creates three distinct duties regarding [the] ICWA in dependency proceedings. First, from the Agency's initial contact with a minor and his [or her] family, the statute imposes a duty of inquiry to ask all involved persons whether the child may be an Indian child. (§ 224.2, subds. (a), (b).) Second, if that initial inquiry creates a "reason to *believe*" the child is an Indian child, then the Agency "shall make *further inquiry* regarding the possible Indian status of the child, and shall make that inquiry as soon as practicable." (*Id*., subd. (e), italics added.) Third, if that further inquiry results in a reason to *know* the child is an Indian child, then the formal notice requirements of section 224.3 apply. (See § 224.2, subd. (c) [court is obligated to inquire at the first appearance whether anyone "knows or has reason to know that the child is an Indian child"]; *id*., subd. (d) [defining circumstances that establish a "reason to know" a child is an Indian child]; § 224.3 [ICWA notice is required if there is a "reason to know" a child is an Indian child as defined under § 224.2, subd. (d)].)' (*In re D.S.* (2020) 46 Cal.App.5th 1041, 1052.)" (*In re G.A., supra*, 81 Cal.App.5th at p. 361, petn. for review pending.)

When there is reason to believe the child is an Indian child, further inquiry is necessary to help determine whether there is reason to know the child is an Indian child, including: "(A) Interviewing the parents, Indian custodian, and extended family members to gather the information required in paragraph (5) of subdivision (a) of Section 224.3[;] [¶] (B) Contacting the Bureau of Indian Affairs and the State Department of Social Services for assistance in identifying the names and contact information of the tribes in which the child may be a member, or eligible for membership in, and contacting the tribes and any other person that may reasonably be expected to have information regarding the child's membership status or eligibility[;] [¶] (C) Contacting the tribe or tribes and any other person that may reasonably be expected to have information regarding the child's membership, citizenship status, or eligibility. Contact with a tribe shall, at a minimum, include telephone, facsimile, or electronic mail

contact to each tribe's designated agent for receipt of notices under the [ICWA] [citation]. Contact with a tribe shall include sharing information identified by the tribe as necessary for the tribe to make a membership or eligibility determination, as well as information on the current status of the child and the case." (§ 224.2, subd. (e)(2).)

"[C]laims of inadequate inquiry into a child's Native American ancestry [are reviewed] for substantial evidence." (*In re G.A., supra*, 81 Cal.App.5th at p. 361, petn. for review pending; see also *In re Rebecca R.* (2006) 143 Cal.App.4th 1426, 1430.) "We must uphold the [juvenile] court's orders and findings if any substantial evidence, contradicted or uncontradicted, supports them, and we resolve all conflicts in favor of affirmance." (*In re A.M.* (2020) 47 Cal.App.5th 303, 314.)

C.

*Agency Inquiry and Harmless Error*

An ICWA violation may be held harmless, "when, even if notice had been given, the child would not have been found to be an Indian child, and hence the substantive provisions of the ICWA would not have applied." (*In re S.B.* (2005) 130 Cal.App.4th 1148, 1162.) Remand for further inquiry is limited "to those cases in which the record gives the reviewing court a reason to believe that the remand may undermine the juvenile court's ICWA finding, the 'reason to believe' rule effectuates the rights of the tribes in those instances in which those rights are most likely at risk, which are precisely the cases in which the tribe's potential rights do justify placing the children in a further period of limbo." (*In re Dezi C.* (2022) 79 Cal.App.5th 769, 781-782, review granted Sept. 21, 2022, S275578.)

Assuming the Agency had a duty to interview extended family under the circumstances presented here, in claiming ICWA deficiencies following termination of parental rights, an appellant must show prejudice from the agency's failure to conduct such interviews. (*In re G.A., supra*, 81 Cal.App.5th at p. 363, petn. for review pending;

see also *In re Dezi C., supra*, 79 Cal.App.5th at p. 779, review granted; *In re Darian R.* (2022) 75 Cal.App.5th 502, 509-510.) Mother has not done so here.

Here, mother indicated she did not have any Native American ancestry. The identity of Z.C.'s father is unknown. The juvenile court made the finding the ICWA does not apply when mother and the maternal grandmother were present in court, without objection. These proceedings have continued for over two years. Nonetheless, at no time did mother, or the maternal grandparents, ever claim possible Native American ancestry or suggest that other relatives may have further relevant information.

Mother cites to no evidence to support her claim that the juvenile court and the Agency, nonetheless, had reason to believe an Indian child is involved such that further inquiry was required, and even on appeal does not proffer any such reason to believe Z.C. has such heritage. (*In re A.C.* (2021) 65 Cal.App.5th 1060, 1069 [parent asserting failure to inquire must make an offer of proof or affirmatively claim Indian heritage on appeal].) There is nothing in the record below or on appeal to suggest that further contact with the maternal grandparents, or other relatives, might contradict mother's statement that she does not have Native American heritage.

"The burden on an appealing parent to make an affirmative representation of Indian heritage is de minimis. In the absence of such a representation, there can be no prejudice and no miscarriage of justice requiring reversal." (*In re Rebecca R., supra*, 143 Cal.App.4th at p. 1431.) We conclude the record shows no prejudice flowing from the Agency's failure to interview extended family members. (See *In re Darian R., supra*, 75 Cal.App.5th at p. 510.)

DISPOSITION

The orders of the juvenile court (terminating parental rights) are affirmed.

_____/s/_____
EARL, J.

We concur:


_____/s/_____
DUARTE, Acting P. J.


_____/s/_____
HOCH, J.